IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DEBRA K. LILES                                                                                    PLAINTIFF

v.                                          Civil No. 09-2034

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                                                    DEFENDANT

## MEMORANDUM OPINION

I.    **Factual and Procedural Background**

Plaintiff, Debra K. Liles, was found to be disabled and entitled to a period of disability insurance benefits ("DIB") and supplemental security income ("SSI") beginning January 1, 1998, due to major depressive disorder, severe, with psychotic features. (Tr. 13). On May 9, 2002,[1] after conducting a continuing disability review,[2] the Commissioner determined that Plaintiff was still disabled. (Tr. 13). Subsequently, on April 7, 2006, the Commissioner found that Plaintiff was no longer disabled as of April 1, 2006, and benefits ceased. (Tr. 13). At Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ") on February 13, 2008. (Tr. 362-409). Plaintiff was present at this hearing and represented by counsel. In addition to depression, Plaintiff alleged that she suffers from fibromyalgia, back and neck pain, diabetes mellitis, anxiety, and peripheral neuropathy in her arms and legs. (Tr. 174-78). On July 22, 2008, the ALJ issued an unfavorable decision, finding that Plaintiff was no longer disabled because she experienced medical improvement and was capable of performing jobs existing in significant numbers in the national

---

[1] This is the comparison point decision. *See* 20 C.F.R. § 404.1594(b)(7).

[2] *See* 20 C.F.R. §§ 404.1589, 416.989.

economy. (Tr. 13-22). Plaintiff submitted additional evidence to the Appeals Council. (Tr. 6). After reviewing the additional medical evidence, the Appeals Council denied Plaintiff's Request for Review on March 13, 2009, thus making the ALJ's decision the final decision of the Commissioner. (Tr. 4-7). Plaintiff now seeks judicial review of that decision.

As a preliminary matter, the court grants Plaintiff's Motion for Leave to Submit New and Material Evidence. (Doc. # 11). The reports offered were submitted to and considered by the Appeals Council, although it ultimately found no basis for reviewing the ALJ's decision. (Tr. 4-7). Where, as here, the Appeals Council considers new evidence in determining whether to review the ALJ's decision, the evidence becomes part of the administrative record on appeal. *Davidson v. Apfel*, 501 F.3d 987, 989-990 (8th Cir. 2007). Thus, the evidence submitted by Plaintiff is properly before this court and is not truly considered "new evidence" for purposes of our review, but instead a supplement to the transcript. Considering it as such, we grant Plaintiff' request.

## II.     Applicable Law

Under the regulations, "if a claimant files additional medical evidence with a request for review prior to the date of the [Commissioner's] final decision, the Appeals Council must consider the additional evidence if the additional evidence: (a) is new, (b) is material, and (c) relates to the period on or before the date of the ALJ's decision." *Williams v. Sullivan*, 905 F.2d 214, 215-16 (8th Cir. 1990). However, the timing of the evidence is not dispositive of whether the evidence is material. *Id.* Evidence obtained after an ALJ's decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984).

Once it is clear that the Appeals Council has considered newly submitted evidence, we do not evaluate the Appeals Council's decision to deny review. *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994). Instead, our role is limited to deciding whether the ALJ's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made. *Id.* Of necessity, this means we must speculate to some extent on how the ALJ would have weighed the newly submitted reports if they had been available at the original hearing. *Id.*

When benefits have been denied based on a determination that a claimant's disability has ceased, the issue is whether the claimant's medical impairments have improved to the point where she is able to perform substantial gainful activity. *Delph v. Astrue*, 538 F.3d 940, 945-46 (8th Cir. 2008); *see* 42 U.S.C. § 423(f)(1). This "medical improvement" standard[3] requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits. *Delph*, 538 F.3d at 945-46. In determining whether a claimant's disability has ceased, the Commissioner applies a sequential analysis involving up to eight steps: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment; (3) whether there has been medical improvement; (4) if there has been medical improvement, whether it is related to the claimant's ability to work; (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether

---

[3] The regulations define medical improvement as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Delph v. Astrue*, 538 F.3d at 947; 20 C.F.R. § 416.994(b)(1)(i).

any exception to medical improvement applies; (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe; (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity ("RFC") to perform any of her past relevant work activity; and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work. *Id.*; *see* 20 C.F.R. § 404.1594(f)).

### III.　Medical Records

Plaintiff has a lengthy history of mental health treatment. In 1991, Plaintiff was hospitalized for a month and received psychiatric treatment following an incident where she had suicidal thoughts and impulses. (Tr. 188). Between 1995 and 1998, Plaintiff received treatment at Western Arkansas Counseling and Guidance Center ("WACGC"), where she was diagnosed with major depressive disorder, severe, without psychotic features. (Tr. 208-11). Plaintiff also complained of chronic back and neck pain associated with degenerative disc disease, frequent tearfulness, trouble sleeping, and auditory and visual hallucinations. (Tr. 191-205). On July 16, 1998, Plaintiff was given a Global Assessment of Functioning ("GAF") of 47, indicating "serious symptoms" or "any serious impairment in social, occupational, or school functioning." (Tr. 208-11); DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 34 (4th ed., 2000).

On October 23, 1998, Dr. Steve Shry, in a mental status evaluation, diagnosed Plaintiff with major depression, recurrent, with mixed psychotic features. (Tr. 190A). Thereafter, in a Psychiatric Review Technique dated July 9, 1999, a DDS consultant found that Plaintiff met listing 12.04 (Affective Disorders). (Tr. 230-38). These evaluations supported Plaintiff's disabled status beginning in 1998.

On April 5, 2002, also known as the comparison point decision, Plaintiff saw Dr. Don Ott for a mental evaluation. Plaintiff discussed her history of degenerative disc disease, fibromyalgia, depression, physical and emotional abuse, smoking (one to two packs per day), and auditory and visual hallucinations. (Tr. 274-75). Her speech was rational, coherent, and goal-directed with no evidence of pressure or loosened associations. (Tr. 275). Plaintiff reported difficulty sleeping, hearing voices, doors opening and closing, and seeing "shadows" of people. (Tr. 275). Plaintiff did her own shopping, cooking, and laundry, but needed help doing heavier housework such as mopping, sweeping, and vacuuming. (Tr. 279). Dr. Ott diagnosed Plaintiff with major depressive disorder, recurrent, severe, with psychotic features. (Tr. 277). He noted no major problems getting along with others, although Plaintiff tended to be socially withdrawn and demonstrated significant limitations in adaptive functioning. (Tr. 278-80).

Subsequently, on February 10, 2006, Dr. Ott performed a second mental evaluation of Plaintiff, finding that she suffered from dysthymic disorder[4] and nicotine dependence. (Tr. 299). In reaching this conclusion, Dr. Ott noted that Plaintiff still experienced visual and audible hallucinations, was tearful at times, portrayed a sad and depressed mood, but denied any suicidal thoughts or attempts. (Tr. 297-98). She was oriented to person, place, and time, her speech was

---

[4] "Dysthymic Disorder and Major Depressive Disorder are differentiated based on severity, chronicity, and persistence. In Major Depressive Disorder, the depressed mood must be present for most of the day, nearly every day, for a period of at least 2 weeks, whereas Dysthymic Disorder must be present for more days than not over a period of at least 2 years. The differential diagnosis between Dysthymic Disorder and Major Depressive Disorder is made particularly difficult by the fact that the two disorders share similar symptoms and that the differences between them in onset, duration, persistence, and severity are not easy to evaluate retrospectively. Usually Major Depressive Disorder consists of one or more discrete major depressive episodes that can be distinguished from a person's usual functioning, whereas Dysthymic Disorder is characterized by chronic, less severe depressive symptoms that have been present for many years." The diagnosis of Dysthymic Disorder is made following Major Depressive Disorder only if the Dysthymic Disorder was established prior to the first major depressive episode, or if there has been a full remission of the major depressive episode (lasting ast least two months) before the onset of the Dysthymic Disorder. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 374 (4th ed., 2000).

rational, coherent, and goal-oriented, and she demonstrated no loss of contact with reality. (Tr. 297-98). At the time of the interview, Plaintiff was taking Xanax, Lorcet, Glucophage, Actose, and Zocor. (Tr. 296). She denied counseling or psychiatric treatment since receiving treatment at WACGC. (Tr. 300). Regarding Plaintiff's activities, Dr. Ott noted that she did her own shopping, cooking, laundry, and housework, but reportedly had trouble bending, stooping, and lifting. (Tr. 302). He found no specific limitations in the areas of concentration, persistence, or pace, and less than two areas with significant limitations in adaptive functioning.[5] (Tr. 302). Dr. Ott opined that improvement in Plaintiff's condition was unlikely without cognitive-behavioral therapy and major lifestyle changes. (Tr. 300).

On February 15, 2006, Dr. Brad Williams, a DDS consultant, completed a mental RFC questionnaire and a Psychiatric Review Technique. After reviewing Plaintiff's medical records, Dr. Williams found that she was moderately limited in her ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others. (Tr. 339-40). Dr. Williams considered listings 12.04 (Affective Disorders) and 12.09 (Substance Addiction Disorders- nicotine dependence), but determined that Plaintiff did not meet or equal the requirements of a listing, as she had only mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation, each of extended duration.

---

[5] This differs from Dr. Ott's 2002 opinion, where he found two or more areas with significant limitations in adaptive functioning. (Tr. 280).

(Tr. 353).

On March 17, 2006, Dr. Suh N. Niba, a DDS consultant, examined Plaintiff and found that she suffered from mild back pain, secondary to degenerative disc disease, diabetes mellitus, and anxiety. (Tr. 310). Upon physical examination, Plaintiff had full range of motion in her cervical and lumbar spine and in both shoulders, elbows and wrists, although she demonstrated abnormal results on the straight-leg raising test bilaterally. (Tr. 307). During limb function testing, Plaintiff demonstrated no abnormalities in her ability to hold a pen and write, touch her fingertips to her palm, grip, oppose her thumb to her fingers, pick up a coin, stand and walk without assistive devices, walk on her heels and toes, and squat and rise from a squatting position. (Tr. 308). Additionally, Plaintiff's x-rays revealed normal disc spaces, normal vertebral body heights, and no bone spurs. (Tr. 309). As a result, Dr. Niba found only mild limitations in Plaintiff's ability to walk, stand, sit, lift, carry, finger, see, hear or speak. (Tr. 310).

On March 29, 2006, Dr. Jerry L. Thomas, a DDS consultant, completed a physical RFC. After reviewing Plaintiff's medical history, Dr. Thomas found that she was able to occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, and stand, walk, or sit for a total of about 6 hours in an 8-hour workday. (Tr. 329). Dr. Thomas cautioned that Plaintiff was limited in the use of her upper extremities and would be restricted in her ability to perform overhead work. (Tr. 329). He found no additional postural, manipulative, visual, communicative, or environmental limitations. (Tr. 330-32).

Plaintiff submits additional records from Dr. Jannel Burch, her treating physician, Dr. Patricia Walz, a pyschologist, and Dr. Paulo Ribeiro[6], a cardiologist. (Doc. # 11, 12). Plaintiff began treatment with Dr. Burch in 2002 for diabetes mellitus, depression, anxiety, reported fibromyalgia, back and neck pain, sleep apnea, and complaints of numbness/tingling in her legs. Plaintiff tried various medications to help control her anxiety and depression, including Xanax, Lexapro, Effexor, Trazodone, Cymbalta, and Paxil. (Tr. 311, 316, Doc. #12, Ex. C). On June 20, 2008, Dr. Burch noted that Plaintiff was "getting a little bit better" while on Paxil. (Doc. #12, Ex. C). Dr. Burch contacted WACGC to encourage Plaintiff to resume counseling, but it does not appear that Plaintiff followed through with the required paperwork, which she found overwhelming. (Tr. 394-96).

On March 1, 2005, Plaintiff complained to Dr. Burch that her blood sugars were "out of control." (Tr. 316). To help stabilize her blood sugars, Plaintiff was placed on a diabetic diet and prescribed several different medications, including Glucophage, Actos, Metformin and, most recently, Byetta (injections). (Tr. 311, 360-61, 374-75). Additionally, Plaintiff took Lorcet for chronic pain associated with fibromyalgia, Lovastatin and Zetia for high cholesterol, Vitamin D and Fosamax for osteopenia, and Atenolol and HCTZ for high blood pressure. (Doc. #12, Ex. C). Plaintiff also complained of diabetic neuropathy of her legs and feet, for which she was prescribed Metanx. (Doc. #12, Ex. C).

On September 20, 2007, Dr. Burch completed an Attending Physician's Statement, in which she indicated that Plaintiff suffers from fibromyalgia, depression, chronic pain, neuropathy, and degenerative disc disease. (Doc. #12, Ex. B). Dr. Burch completed a "check the box" form indicating

---

[6] The court has reviewed the records of Dr. Ribeiro and concludes that Plaintiff's diagnosis of coronary artery disease relates to a later time and was not present during the relevant time period.

that Plaintiff's symptoms were severe enough to interfere with her attention, concentration and ability to tolerate work stress, that she would require unscheduled breaks, and would likely be absent from work more than four days per month. (Doc. #12, Ex. B). Additionally, Dr. Burch noted that Plaintiff could perform simple grasping with both hands and could operate foot controls freely, but could not do any pushing/pulling or fine manipulation with either hand. (Doc. #12, Ex. B).

      Plaintiff also submits a Mental Diagnostic Evaluation, dated August 21, 2008, performed by Patricia J. Walz. (Doc. # 12, Ex. A). At the appointment, Plaintiff discussed her history of anxiety, depression, chronic pain, fibromyalgia, frequent hallucinations, and diabetes. When asked about her activities, Plaintiff stated that she does all the dishes, laundry, and cooking, but sometimes receives help from her daughter and brother. At this point, Plaintiff had also received guardianship of her nine year old grandson, for whom she is the primary caretaker. (Tr. 379). Plaintiff's mood was reportedly sad and anxious, but her thought processes were logical and goal-oriented. (Doc. # 12, Ex. A). Dr. Walz diagnosed Plaintiff with major depression, recurrent, moderate to severe, with a history of psychosis. She gave Plaintiff a GAF score of 45-50. Dr. Walz opined that Plaintiff's adaptive functioning was impaired by her anxiety, racing thoughts, and social discomfort. (Doc. # 12, Ex. A). In an accompanying Medical Source Statement of Ability to do Work-related Activities (Mental), Dr. Walz found marked impairments in Plaintiff's ability to understand, remember, and carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting. Dr. Walz found moderate limitations in Plaintiff's ability to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions. (Doc. # 12, Ex. A).

**IV.    Discussion**

The ALJ made the following findings: (1) as of April 1, 2006, the claimant had not engaged in substantial gainful activity; (2) as of April 1, 2006, the claimant had the following medically determinable impairments: mood disorder, fibromyalgia, diabetes mellitus with peripheral neuropathy, and anxiety; (3) since April 1, 2006, the claimant has not had an impairment or combinations of impairments which meets or medically equals a listing; (4) medical improvement occurred as of April 1, 2006; (5) medical improvement is related to the claimant's ability to work; (6) the claimant has continued to have a severe impairment or combination of impairments; (7) based on the current impairments, the claimant has the RFC to perform light work;[7] (8) the claimant cannot perform her past relevant work as a companion; (9) transferability of job skills is immaterial to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not she has transferable job skills; (10) beginning on April 1, 2006, considering the claimant's age, education, work experience, and RFC, she has been able to perform a significant number of jobs in the national economy; and, therefore (11) the claimant's disability ended on April 1, 2006, and she has not become disabled again since that date. (Tr. 11-22).

---

[7] More specifically, the ALJ found that Plaintiff can lift and/or carry 10 pounds frequently and 20 pounds occasionally, secondary to pain, sit, stand, and/or walk for 6 hours out of an 8-hour workday, and do no overhead reaching bilaterally. Due to neuropathy in her feet, she can occasionally climb ramps and/or stairs, stoop, bend, crouch, crawl, kneel, and balance, but can never climb scaffolds, ladders, or ropes or be exposed to unprotected heights, dangerous equipment, or machinery. She can do no driving as part of work secondary to anxiety, pain in her feet, and side effects of medications. From a mental standpoint, the ALJ concluded that Plaintiff is able to perform activities with non-complex, simple instructions that require little judgment, are routine and repetitive, and are learned by rote with few variables. Supervision should be concrete, direct, and specific. Additionally, Plaintiff can only perform work where contact with the public and co-workers is incidental only. (Tr. 19). A vocational expert testified that, within these confines, Plaintiff could perform work as a meat processor, DOT # 525.687-074, of which there are 1,300 jobs in Arkansas and 75,000 nationwide, mail clerk, DOT # 209.687-026, of which there are 500 jobs in Arkansas and 79,000 nationwide, or hand packager, DOT #929.687-054, of which there are 2,100 jobs in Arkansas and 203,000 nationwide. (Tr. 405-06).

Plaintiff contends that the ALJ erred by: (1) dismissing her subjective complaints; (2) improperly determining her RFC; and (3) failing to fully and fairly develop the record. *See* Pl.'s Br. 6-19.

A. <u>Plaintiff's Subjective Complaints</u>

Plaintiff first argues that the ALJ erred by making an insufficient credibility determination. *See* Pl.'s Br. 16-20. When evaluating a claimant's subjective allegations, the ALJ must consider all evidence relating to: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) any precipitating and aggravating factors; (4) the dosage, effectiveness and side effects of medication; and (5) any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). It is well-settled that an ALJ need not explicitly discuss each *Polaski* factor; it is "sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009). When making a credibility determination, the ALJ is "not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations." *Polaski*, 739 F.2d at 1322. However, subjective complaints may be discounted if there are inconsistencies in the medical evidence as a whole. *Id.*

Plaintiff reportedly suffers from depression, anxiety, diabetes mellitus, chronic pain due to degenerative disc disease and fibromyalgia, neuropathy in her limbs, high blood pressure and high cholesterol. At the hearing, Plaintiff testified that she no longer attends church and avoids social situations because of uncontrollable crying. (Tr. 390). She has walked out of the grocery store on several occasions due to crying episodes. (Tr. 392). Plaintiff also reported seeing and hearing "shadow people" during the night. (Tr. 393). She suffers from anxiety and was noticeably shaking at the hearing. (Tr. 395). Plaintiff has not received counseling or therapy in ten years because the

paperwork is too overwhelming, but she continues to take Xanax to help control her symptoms. (Tr. 394). She complains of blurred vision, neuropathy, and dizziness as a result of diabetes. (Tr. 399). She reportedly can no longer sew, knit, or perform activities requiring fine manipulation with her fingers. (Tr. 397). Additionally, she must take breaks five to seven times a day due to pain, poor sleep, and fatigue. (Tr. 400).

Plaintiff has guardianship of her nine year old grandson, who first came to live with her in June of 2006. (Tr. 376). Plaintiff's grandson dresses himself, makes his own breakfast, and rides the bus to and from school. (Tr. 382). Plaintiff is able to prepare meals, do laundry, and shop. (Tr. 388-89). Plaintiff takes her grandson to play basketball twice a week at the Boys and Girls Club. (Tr. 383). She also checks his homework on a daily basis, attends parent-teacher conferences, and takes him to the library at every opportunity. (Tr. 382-85).

The ALJ found that although Plaintiff's impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Tr. 20). Specifically, the ALJ found that Plaintiff's daily activities and failure to seek counseling were inconsistent with her allegations of disabling pain. (Tr. 20). We agree. Although Plaintiff is to be praised for assuming the role of caretaker to her grandson, such immense responsibility is inconsistent with her alleged inability to function on a day-to-day basis. For instance, Plaintiff testified that filling out the required paperwork to obtain counseling is overwhelming to her, yet she is able to oversee her grandson's daily activities, including homework, basketball practice, and trips to the library. (Tr. 396-97). Additionally, Plaintiff actively participates in parent/teacher conferences, takes her grandson grocery shopping with her, and performs household chores, such as cleaning, cooking, and doing laundry. *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir.

2008) (claimant's ability to perform housework, take care of her child, cook, and drive was inconsistent with her self-reported limitations). Here, the ALJ cited the proper standard, considered the factors in conjunction with Plaintiff's testimony, and gave specific reasons for discounting Plaintiff's subjective complaints. *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) ("We will defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"). As such, we find no error in the ALJ's credibility determination.

### B. Plaintiff's RFC

Plaintiff contends that the ALJ failed to take into account all of her physical and mental limitations when determining her RFC. *See* Pl.'s Br. 12-16. A disability claimant has the burden of establishing her RFC. *Eichelberger*, 390 F.3d at 591; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). A claimant's RFC is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Masterson*, 363 F.3d at 737. The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be "some medical evidence" to support the ALJ's determination. *Eichelberger*, 390 F.3d at 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir 2000).

The ALJ found that Plaintiff was capable of performing light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). More specifically, the ALJ found:

> She can lift and carry 10 pounds frequently and 20 pounds occasionally, secondary to pain; sit, stand, and/or walk for 6 hours total out of an 8-hour workday; and do no overhead reaching, bilaterally. Due to neuropathy in her feet, she can occasionally

> climb ramps and/or stairs, stoop, bend, crouch, crawl, kneel, and balance; never climb scaffolds, ladders, or ropes; never be exposed to unprotected heights, dangerous equipment, or machinery. She can do no driving as part of work secondary to anxiety, pain in her feet, and side effects of medications. From a mental standpoint, she is able to perform activities with non-complex simple instructions that require little judgment; that are routine and repetitive; and learned by rote with few variables; where superficial contact is incidental to work with the public and co-workers; and where supervision is concrete, direct, and specific.

(Tr. 19). We find that substantial evidence supports this assessment.

       1. <u>Mental Impairments</u>

First, we reject Plaintiff's argument that the record contains no mental RFC. To the contrary, a mental RFC and Psychiatric Review Technique were completed by Dr. Brad Williams, a psychologist and DDS consultant, on November 3, 2006. (Tr. 339-53). Dr. Williams found that Plaintiff was moderately limited in her ability to maintain attention and concentration, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others. (Tr. 339-40). Based on these findings, Dr. Williams determined that Plaintiff could perform work where interpersonal contact is routine, but superficial, complexity of tasks is learned by experience (several variables), judgment is used with limits, and supervision is little for routine tasks but detailed for non-routine tasks. (Tr. 341).

In making its determination, the court considered the mental evaluation and accompanying Medical Source Statement of Ability to do Work-related Activities (Mental) completed by Dr. Patricia Walz on August 21, 2008. (Doc. # 12, Ex. A). We cannot conclude that this evidence would have impacted the ALJ's determination. First, Dr. Walz evaluated Plaintiff only once. *Jenkins v. Apfel*,

196 F.3d 922, 925 (8th Cir. 1999) (the assessment of a doctor who evaluates a claimant once or not at all does not usually constitute substantial evidence). Additionally, Plaintiff saw Dr. Walz a month after the ALJ's dated decision, which leads us to believe that the appointment was secured for the primary purpose of generating evidence rather than obtaining medical treatment. *See Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (claimant's encounters with doctors linked primarily to quest to obtain benefits).

Moreover, Plaintiff was evaluated on two separate occasions by Dr. Ott, who was able to note differences in Plaintiff's adaptive functioning. In 2006, Dr. Ott diagnosed Plaintiff with dysthymic disorder and nicotine dependence, a clear change from his 2002 diagnosis of major depressive disorder, recurrent, severe, with psychotic features. (Tr. 277, 299). This diagnosis, in conjunction with Plaintiff's increased activities of daily living, convinced the ALJ that Plaintiff experienced medical improvement related to her ability to work. We find that substantial evidence supports this determination.

### 2. Physical Impairments

Plaintiff asserts that the ALJ failed to take into consideration her alleged hand impairments as reflected in the Attending Physician's Statement completed by Dr. Burch on September 20, 2007. (Doc. #12, Ex. B). Dr. Burch's form indicated that Plaintiff would be precluded from pushing, pulling, and performing fine manipulation with both hands. She further noted that Plaintiff's impairments would likely cause her to miss more than four work-days a month. (Doc. # 12, Ex. B).

A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in a clamant's record. *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009);

20 C.F.R. § 404.1527(d)(2). The record must be evaluated as a whole to determine whether the treating physician's opinion should be controlling. *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). A treating physician's evaluation may be disregarded where other medical assessments "are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* at 920-21.

We find that the Attending Physician's Statement would not have impacted the ALJ's determination, for it is inconsistent with Dr. Burch's own treatment records as well as the medical evidence as a whole. Dr. Burch's records frequently note diabetic neuropathy in Plaintiff's lower legs, but never indicate neuropathy in her arms and fingers. (Tr. 311, 360-61). On April 5, 2007, Plaintiff complained of pain in her upper right arm and elbow. (Doc. #12, Ex. C). Dr. Burch took an x-ray of Plaintiff's shoulder, which revealed no obvious abnormalities. Upon physical examination, range of motion was limited to about 90 degrees, but Dr. Burch noted no numbness, tingling, or neurological deficits. (Doc. # 12, Ex. C). Moreover, Dr. Burch's notes reflect that Plaintiff had been doing outdoor pruning, an activity that is inconsistent with her alleged hand impairments.

In addition, Dr. Burch's Attending Physician's Statement appears to be primarily based on Plaintiff's subjective complaints rather than concrete medical documentation. On September 20, 2007, Dr. Burch noted:

> She says the depression makes the chronic pain worse and the chronic pain makes the depression worse, that all makes the fibromyalgia worse and all of this together she would not be able to be employed full-time. Her symptoms interfere with attention and concentration. She does not handle stress well. She would have to take frequent breaks and feels like she would miss more than 5-6 days a month if she did have a job. I did fill out a paper for her Lawyer with those statements present.

(Tr. 360). These treatment notes reveal that the Attending Physician's Statement is nothing more than a catalog of Plaintiff's subjective complaints. As such, it cannot be regarded as substantial evidence in favor of continued disability. Accordingly, substantial evidence supports the ALJ's RFC determination.

### C. Duty to Fully and Fairly Develop the Record

In her final argument, Plaintiff contends that the ALJ failed to fully and fairly develop the record concerning her mental and physical impairments. *See* Pl.'s Br. 6-12. We disagree.

The ALJ has a duty to fully and fairly develop the record, even if a claimant is represented by counsel. *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). "It is well-settled that the ALJ's duty to fully and fairly develop the record includes the responsibility of ensuring that the record includes evidence addressing the alleged impairments at issue from either a treating or examining physician. *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir.2000). While the Secretary is under no duty to go to inordinate lengths to develop a claimant's case, he must "make an investigation that is not wholly inadequate under the circumstances." *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994) (quoting *Miranda v. Secretary of Health, Educ. & Welfare*, 514 F.2d 996, 998 (1st Cir. 1975)). There is no bright-line test for determining when the Secretary has failed to adequately develop the record; the determination must be made on a case by case basis. *Battles*, 36 F.3d at 45 (quoting *Lashley v. Secretary of Health & Human Serv.,* 708 F.2d 1048, 1052 (6th Cir.1983)).

We find that the ALJ had sufficient evidence to make a fully informed decision concerning Plaintiff's disability. The record is replete with medical documentation pertaining to both Plaintiff's physical and mental impairments. Despite Plaintiff's contention, there are two physical assessments in the record, one dated March 17, 2006, completed by Dr. Suh N. Niba, and one dated March 29,

2006, completed by Dr. Jerry Thomas. (Tr. 304-10, 329-35). Additionally, we have considered the records submitted by Plaintiff, including the Attending Physician's Statement from Dr. Burch and Mental Diagnostic Evaluation performed by Dr. Patricia Walz, and conclude that they would have had no impact on the ALJ's determination. For these reasons, we find that the ALJ's conclusion is supported by substantial evidence and should be affirmed.

### V.    Conclusion

Having carefully reviewed the record, the undersigned finds that substantial evidence supports the ALJ's determinations at each step of the medical improvement process, and thus the decision should be affirmed. Accordingly, Plaintiff's complaint should be dismissed with prejudice.

ENTERED this 31st day of March 2010.

/s/ J. Marschewski
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE